# Third District Court of Appeal

## State of Florida

Opinion filed September 09, 2015.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D15-641
Lower Tribunal No. 15-763
_____


**CT Miami, LLC,**
Appellant,

vs.

**Samsung Electronics Latinoamerica Miami, Inc.,**
Appellee.


A non-final appeal from the Circuit Court for Miami-Dade County, John W. Thornton, Judge.

Bilzin Sumberg Baena Price & Axelrod LLP, and David Gersten, Jeffrey Gutchess, Daniel Tropin, and Brandon Rose, for appellant.

Holland & Knight LLP, and Rodolfo Sorondo, Jr., Alex M. Gonzalez, Israel J. Encinosa, and Rebecca M. Plasencia, for appellee.


Before WELLS, ROTHENBERG, and SCALES, JJ.

ROTHENBERG, J.

CT Miami, LLC ("CT Miami") appeals the trial court's order denying its motion to stay arbitration without an evidentiary hearing. Because we agree with the trial court that CT Miami did not raise a substantial issue regarding the agreement to arbitrate, we affirm the trial court's ruling.

## FACTUAL BACKGROUND

Samsung Electronics Latinoamerica Miami, Inc. ("SELA") is a Miami-based subsidiary of the multi-national electronics and cell phone manufacturer, Samsung Electronics, Ltd. ("Samsung"). CT Miami is an open-market distributor of smart phones, meaning that CT Miami sells phones to wholesale and retail establishments rather than cellular service providers like AT&T or T-Mobile.

In 2009, CT Miami approached SELA to discuss wholesale open-market distribution plans for many of SELA's phones. After some preliminary discussions, SELA's vice president and sales manager at the time, Ernesto Piedra, sent CT Miami an email stating: "[Prior] to any business deal we make, it is now required we have an agreement in place." Piedra attached a document titled "DISTRIBUTOR AGREEMENT" to that email and requested that CT Miami finalize and sign the agreement.

The Distributor Agreement is a form contract that establishes the general terms of the relationship between the parties and sets expectations for future dealings. The Distributor Agreement expressly defines the "Effective Date" of the

2

contract as "the date on which all parties have signed and dated this Agreement," and it states that the contract will automatically renew yearly unless one party gives the other thirty days' written notice of its intent to cancel the agreement or immediate written notice of termination upon the occurrence of certain conditions. Finally, and most relevant to this case, the Distributor Agreement also contains an arbitration clause stating that "any controversy or claim arising out of or relating to this Agreement, or the breach thereof," is to be resolved by arbitration administered under the rules of the American Arbitration Association ("AAA") in Miami, Florida.

As requested in Piedra's email, CT Miami's CFO, Randy Williams, filled in the blanks in the Distributor Agreement with the appropriate information and then signed, dated, and returned the Distributor Agreement to SELA via email on June 23, 2009. CT Miami's CEO, Samuel Ohev-Zion, sent an email to SELA in September 2009 stating that CT Miami had never received a countersigned copy of the Distributor Agreement from SELA, and he requested a copy for CT Miami's records. Apparently, SELA never signed the Distributor Agreement and never provided CT Miami with a copy of the same. Nonetheless, the companies began doing business together shortly after Williams signed the Distributor Agreement.

The parties' business agreement proved to be mutually beneficial or, more accurately, wildly successful in the short term. Between June 2009 and summer

2014, SELA and CT Miami transacted nearly $1 billion in open-market cell phone sales together, with CT Miami dramatically increasing SELA's open-market sales in the region. However, in 2014, the public demand for the Galaxy S5 was significantly less than either SELA or CT Miami had anticipated; the market retail value of the Galaxy S5 fell to approximately $420 per unit; and CT Miami was forced to sell the phones at a loss, resulting in a substantial hit to its overall business. Meanwhile, competing open-market distributors began selling the phones at a lower price than CT Miami, which further reduced CT Miami's profits. Following this setback, CT Miami failed to pay SELA on several of the outstanding invoices totaling, according to SELA, approximately $21 million.

After CT Miami refused to pay its past-due invoices, SELA filed a Statement of Claim and Demand for Arbitration with the AAA, citing the Distributor Agreement as the operative contract between the parties and the arbitration clause therein as a basis for the AAA's jurisdiction over the dispute. SELA claims that the Distributor Agreement was the sole contract governing the parties' long-term relationship. There do not appear to be any alternative documents governing the parties' relationship,[1] and several emails between officers in both companies, along with CT Miami's yearly financial statements, all

---

[1] There are additional documents between the parties discussing specific transactions and sales incentives, but none address the big-picture partnership or sales relationship as the Distributor Agreement appears to do.

4

reference the Distributor Agreement.[2]

Thereafter, CT Miami filed an action in Miami-Dade County Circuit Court alleging that it had not paid the past-due invoices because SELA had first breached its agreement to provide price protection and make CT Miami whole in the event of a soft market on any of SELA's phones. CT Miami claims that the parties never intended the Distributor Agreement to control the relationship and that they had opted instead to reach short-term oral and email agreements on a per-deal basis. CT Miami alleges that among these many oral agreements was one guaranteeing that SELA would provide its products to CT Miami at the lowest prices and would also provide price protection—meaning that SELA would partially or fully offset any loss CT Miami took on the products it obtained from SELA—so that CT Miami could continue to move a large volume of SELA's cell phones at a very small profit margin.

CT Miami filed a motion to stay arbitration concurrently with its complaint, alleging that the parties had never agreed to the terms of the Distributor Agreement due to SELA's failure to sign the document as required for execution, and thus,

---

[2] CT Miami disputes that these emails and financial statements are referencing that specific Distributor Agreement, claiming instead that the parties are speaking generally of their oral agreement to have CT Miami distribute SELA's products. Further, CT Miami argues that any phrasing in the emails that appears to be quoted from the Distributor Agreement is from its 2009 financial statements. In response to that argument, we must borrow a legal term from negligence cases: "res ipsa loquitur"—the emails speak for themselves.

5

that there was no enforceable arbitration clause to make the disputes arbitrable. In support of its motion to stay arbitration, CT Miami attached several documents and emails between the parties discussing the mutually beneficial partnership between the companies—which CT Miami cites as evidence of the oral agreements to provide price protection and the lowest prices—along with two affidavits from former SELA employees (employees that had left SELA to work at CT Miami) averring that SELA officers had a practice of intentionally refusing to countersign contracts such as the Distributor Agreement because they did not want to be bound by a written contract.

SELA filed a competing motion in the circuit court to stay the action and compel arbitration, arguing that the Distributor Agreement was in fact the operative contract and that, even without a countersignature, the parties' subsequent communications and course of conduct proved that they both intended to be bound by the Distributor Agreement. SELA's motion specifically referenced all the emails and financial statements that mentioned a "distributor agreement" or quoted language from the 2009 Distributor Agreement CT Miami had signed.

The trial court conducted a non-evidentiary hearing on the competing motions to compel/stay arbitration. At the hearing, SELA continued to argue that the Distributor Agreement was valid and that both parties' claims had to be submitted to arbitration. CT Miami argued that it had raised a substantial issue

6

regarding whether the Distributor Agreement was ever formed and that, at the very least, it was entitled to an evidentiary hearing. After the hearing, the trial court ruled that the parties were bound by the Distributor Agreement, and thus, that the parties had to submit their disputes to arbitration. The trial court finalized its findings and conclusions in a written order that states:

> THIS CAUSE comes before the Court on Defendant Samsung Electronics Latinoamerica Miami, Inc.'s ("SELA") Motion to Compel Arbitration and Stay Litigation and on Plaintiff CT Miami, LLC's ("CT") Motion to Stay Arbitration. The Court has reviewed the motions and all corresponding briefs, exhibits, and supporting affidavits. An expedited hearing was held on March 9, 2015.
>
> For the reasons set forth in the record, the Court makes the following determinations:
>
> 1. It is undisputed that SELA sent the distributor agreement containing the arbitration provision at issue (the "Distributor Agreement") to CT and that CT signed the Distributor Agreement and sent it back to SELA.
>
> 2. The claims at issue fall within the scope of the arbitration provision in the Distributor Agreement and SELA has not waived its right to arbitrate pursuant to the arbitration provision.
>
> 3. CT has not overcome the presumption that the contract that CT signed is a valid and binding agreement to arbitrate. See Thompkins v. Lil' Joe Records, Inc., 476 F.3d 1294, 1305 n.12 (11th Cir. 2007) (quoting Dodge of Winter Park, Inc. v. Morley, 756 So. 2d 1085, 1085-86: "Generally, it is enough that the party against whom the contract is sought to be enforced signs it."); Dodge of Winter Park, Inc. v. Morley, 756 So. 2d 1085, 1085-86 (Fla. 5th DCA 2000) (holding that an arbitration agreement enforceable against party who signed the agreement even where the other party did not sign it because "[g]enerally, it is enough that the party against whom the contract is sought to be enforced signs it.").
>
> 4. Furthermore, the Court finds based on the record before it, including, but not limited to, the Distributor Agreement signed by CT, email communications, and CT's audited financial statements for 2010, 2011, 2012 and 2013, that the parties performed in accordance

7

with the Distributor Agreement and in a manner consistent with the Distributor Agreement being a valid and binding agreement.

5.   The Court finds, under the Federal Arbitration Act and the ICDR rules, that the arbitrator has the jurisdiction to make the determination on whether a valid arbitration clause exists.

6.   Additionally, CT has not met its burden of establishing a substantial issue exists as to the making of the Distributor Agreement, and thus an evidentiary hearing and discovery is not necessary.

7.   The Court finds that CT has not waived any future rights to challenge the arbitration at a later time.

8.   The Court finds that CT's participation in the pending arbitration thus far did not result in a waiver of any right it may have had to litigate (though the Court nonetheless denies CT's Motion to Stay Arbitration and grants SELA's Motion to Compel Arbitration for the separate reasons stated in this Order).

9.   The Court further finds that if CT participates in the arbitration pending any appeal of this order that such participation will not be deemed a waiver of its right to object to the arbitration.

Accordingly, it is ORDERED AND ADJUDGED that CT's Motion to Stay Arbitration is DENIED, and SELA's Motion to Compel Arbitration and Stay Litigation is GRANTED. This litigation is hereby stayed and the Court reserves jurisdiction for further proceedings including motions to enforce an arbitral award.

CT Miami appeals the trial court's order on several bases. First, CT Miami argues that the trial court has exclusive jurisdiction to determine whether an agreement was reached between the parties such that an enforceable arbitration clause exists, and the trial court erred by punting on this issue and allowing the arbitrator to decide. Second, CT Miami argues that the trial court erred by making its findings without conducting an evidentiary hearing.

We agree with CT Miami that it is the exclusive province of the trial court to determine the validity of an agreement to arbitrate, and thus, paragraph (5) of the

8

trial court's order was error. The validity of the arbitration provision is, however, not at issue. Rather, CT Miami claims that no binding agreement exists because SELA never executed the Distributor Agreement. Because we find that the trial court correctly ruled that CT Miami has not presented a substantial issue regarding the formation of the Distributor Agreement, and thus a binding contract had been formed, we conclude that the trial court did not err by ordering the parties to arbitration.

## ANALYSIS

While we review a trial court's ruling on a motion to compel arbitration de novo, DFC Homes of Fla. v. Lawrence, 8 So. 3d 1281, 1282 (Fla. 4th DCA 2009), we are mindful that arbitration provisions are favored by the courts and that all doubts should be resolved in favor of arbitration, Mendez, Jr. v. Hampton Court Nursing Ctr., LLC, 140 So. 3d 671, 674 (Fla. 3d DCA 2014). The parties agree that the arbitration clause in this case is governed by the Florida Arbitration Code, chapter 680, Florida Statutes (2009) ("FAC"), rather than the Federal Arbitration Act ("FAA").[3] Moreover, although the FAC was revised substantially in 2013, the

[3] It is unclear whether CT Miami and SELA conducted their business wholly within the state of Florida, in which case the FAC would undoubtedly control, or whether their transactions included interstate commerce. To the extent the contract affects interstate commerce in Florida, it is governed by both the FAC and the FAA. Shotts v. Winter Haven, Inc., 86 So. 3d 456, 461 (Fla. 2011). Although both state and federal arbitration acts apply to such clauses, the FAC governs the proceedings to the extent it does not directly conflict with the FAA. Id. at 463-64. The sections of the FAC and FAA relevant to the determination of this appeal,

9

parties correctly agree that the pre-2013 version of the statute applies because the contract at issue was drafted and signed in 2009.  See § 682.013, Fla. Stat. (2015) (providing that the 2013 Revised FAC governs agreements to arbitrate made on or after July 1, 2013, and that other agreements shall be governed by the applicable law existing at the time the parties entered into the agreement).  We now apply these legal principles to the disputed issues.

I.    **Whether the trial court or arbitrator should decide whether an agreement was formed.**

The first issue is whether the arbitrator or the trial court should determine whether the parties entered into an agreement to arbitrate when one of the parties disputes that the contract containing the arbitration provision was ever reached in the first place.  We hold that this particular issue is exclusively within the province of the trial court, not the arbitrator.

"Under both federal statutory provisions and Florida's arbitration code, there are three elements for courts to consider in ruling on a motion to compel arbitration of a given dispute: (1) whether a valid written agreement to arbitrate exists; (2) whether an arbitrable issue exists; and (3) whether the right to arbitration was waived."  Seifert v. U.S. Home Corp., 750 So. 2d 633, 636 (Fla. 1999); Truly

_____

however, are "virtually identical," Rowe Enters. v. Int'l Sys. & Elecs. Corp., 932 So. 2d 537, 539 (Fla. 1st DCA 2006) (quoting Merrill Lynch Pierce Fenner & Smith, Inc. v. Melamed, 425 So. 2d 127, 128 n.4 (Fla. 4th DCA 1982)), so the determination is not dispositive of the case at bar.

Nolen of Am., Inc. v. King Cole Condo. Ass'n, 143 So. 3d 1015, 1016-17 (Fla. 3d DCA 2014). The parties agree that SELA has not waived its right to arbitrate and that their dispute is subject to the arbitration provision if the contract and that provision are valid. Thus, the only issue presented by this appeal is the first of those elements: whether a valid written agreement to arbitrate exists. The question of which decision-maker (the trial court or the arbitrator) should determine whether a valid agreement exists would appear on its surface to be a simple one, but the case law from federal and Florida courts makes that determination somewhat difficult. Some challenges to a contract containing an arbitration provision or the arbitration provision itself are to be decided by the trial court, and others are to be decided by the arbitrator.

The United States Supreme Court has written extensively on this issue, albeit in reference to the FAA, not the FAC. For example, in Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440 (2006), the Court addressed a challenge to an arbitration agreement in a Florida contract based on a party's allegations that the contract itself was illegal and void as a matter of public policy. Id. at 442. The Court expressly noted and addressed the following types of challenges to arbitration agreements: (1) challenges to the validity of the agreement to arbitrate, id. at 444, which must be decided by the trial court, id. at 445-46; and (2) challenges to the contract as a whole, either on a ground that directly affects the

11

entire agreement (e.g., the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid, id. at 444, which should be decided by the arbitrator, id. at 445-46. The Court, however, also identified a third type of challenge to an arbitration agreement or contract—"whether any agreement between the alleged obligor and obligee was ever concluded"—and expressly reserved ruling on which decision maker was to decide such a challenge. Id. at 444 n.1. The Court reaffirmed the validity of these three categories of challenge in its more-recent decision of Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63, 70, 70 n.2 (2010); see also Rowe, 932 So. 2d at 539 (inferring from the above-cited United States Supreme Court decisions that there are three categories of challenges to an arbitration agreement).

We therefore conclude that there are three categories of challenge to an arbitration clause: (1) a challenge specific to the arbitration provision itself; (2) a challenge to the contract as a whole that would invalidate the contract after an agreement has been reached, such as fraud, duress, or a contractual provision (other than the arbitration provision itself) that is contrary to public policy, see Shotts, 86 So. 3d at 480-81 (holding that the trial court, not the arbitrator, must decide a challenge to an arbitration provision based on public policy); and (3) a challenge to the contract as a whole that alleges there was never an agreement between the parties to form a contract (and therefore no agreement to form the

12

arbitration clause contained therein) in the first place.

To date, the United States Supreme Court has not expressly ruled whether that third category should be decided by the trial court or the arbitrator, but lower court decisions—both state and federal—have largely agreed that this third category must be decided by the trial court. See, e.g., Chastain v. Robinson-Humphrey Co., 957 F.2d 851, 854 (11th Cir. 1992) (holding that the trial court must determine whether there was an agreement to arbitrate when the party contesting arbitration claimed she had never signed the contract or intended to be bound); Lepisto v. Senior Lifestyle Newport Ltd. P'ship, 78 So. 3d 89, 93 (Fla. 4th DCA 2012) ("[I]t is for a court, not an arbitrator, to decide in the first instance whether a party signed a contract and assented to its terms."); Rowe, 932 So. 2d at 539 (holding that the trial court must determine whether there was ever an agreement when the party resisting arbitration alleged that its signature was a forgery); Bank of the Ozarks, Inc. v. Walker, 434 S.W.3d 357, 360-61 (Ark. 2014) (holding that the trial court must determine whether an agreement to arbitrate was reached when several contracts the subject of a class action allegedly did not contain an arbitration provision); Texas La Fiesta Auto Sales, LLC v. Belk, 349 S.W.3d 872, 881-82 (Tex. Ct. App. 2011) (holding that the trial court must determine whether a subsequent contract superseded and invalidated a prior contract containing an arbitration provision).

We agree with and join the above holdings due to their undeniable logic. Arbitrators have no inherent authority over a dispute or the parties to that dispute; the only authority vested in the arbitrator is that contractually designated in the parties' agreement. Thus, in the absence of an agreement to allow the arbitrator to decide the dispute, the arbitrator has no authority to determine anything. See Chastain, 957 F.2d at 854 ("If a party has not signed an agreement containing arbitration language, such a party may not have agreed to submit grievances to arbitration at all."). Thus, we hold that challenges to either party's agreement to the contract in the first instance are exclusively to be determined by the trial court and that, when raised, such challenges must be decided by the trial court before arbitration can be compelled.

CT Miami's challenge in this case undeniably falls into this third category of challenge; it is claiming that no contract exists due to SELA's failure to sign the Distributor Agreement. Thus, the trial court was legally required to rule on this issue before compelling the parties to arbitration. The trial court's finding in paragraph 5 of the order (that under the FAA and ICDR rules, the arbitrator can decide whether a valid arbitration clause exists) is legally incorrect. Additionally, to the extent that paragraph 7 of the trial court's order (finding that CT Miami has not waived future rights to challenge the arbitration) is meant to allow CT Miami to relitigate that issue before the arbitrator, it is also legally incorrect. The trial

14

court must determine whether an agreement to arbitrate exists **before** compelling arbitration; only those defenses that may invalidate the contract post-agreement may be arbitrated. The trial court's erroneous findings in paragraphs 5 and 7 of the order do not, however, necessarily mandate reversal if the trial court also correctly ruled that there was in fact a valid agreement to arbitrate. We turn now to that issue.

## II. Whether the trial court correctly found that an agreement to arbitrate had been reached without conducting an evidentiary hearing.

As explained above, if the trial court had simply deferred ruling on the contract formation issue as CT Miami avers, we would have reversed its decision compelling arbitration and remanded for an evidentiary hearing because that determination is exclusively vested in the trial court, not the arbitrator. That, however, is not what happened. The trial court ruled that the parties entered into a binding contract containing an arbitration provision. Thus, if the trial court correctly ruled that the parties entered into a binding contract containing an arbitration provision, and that finding was properly reached without an evidentiary hearing, we may affirm despite the erroneous conclusion in paragraph 5 of the order. Cf. State Farm & Cas. Co. v. Levine, 837 So. 2d 363, 365 (Fla. 2002) (holding that a trial court order reaching the right result with erroneous or incomplete reasoning can be affirmed under the "tipsy coachman" doctrine so long

15

as the alternative ruling is supported by the record before the trial court); Robertson v. State, 829 So. 2d 901, 906-07 (Fla. 2002) ("This longstanding principle of appellate law, sometimes referred to as the 'tipsy coachman' doctrine, allows an appellate court to affirm a trial court that 'reaches the right result, but for the wrong reasons' so long as 'there is any basis which would support the judgment in the record.' (quoting Dade Cnty. School Bd. v. Radio Station WQBA, 731 So. 2d 638, 644 (Fla. 1999)).[4] We turn to each of these issues in turn.

a. **The trial court made specific findings that an agreement to arbitrate had been reached.**

The trial court did not simply defer ruling on the issue of whether the Distributor Agreement was a binding contract. Although we conclude that the trial court's finding in paragraph 5 of the order was legally infirm—as was paragraph 7 to the extent it allows the arbitrator to rehear the issue of contract formation—it also made a specific finding that the agreement was valid and binding for several reasons. First, in paragraph 3 of the order, the trial court specifically ruled, with supporting citations to both federal and Florida decisions: "CT [Miami] has not

---

[4] The "tipsy coachman" doctrine is most often applied when a lower court applies reasoning that is completely incorrect, yet reaches the right result in the eyes of a reviewing court that supplies the correct alternative theory. In this case, the trial court ostensibly supplied its own alternative theories: It ruled that the contract was a valid and binding agreement and, just to be safe, also found that the arbitrator could take another look at it. We believe the "tipsy coachman" rule of appellate efficiency applies with equal (or likely even greater) force when the trial court is more akin to a "cautious coachmen" that reaches the correct result while supplying two alternative bases for the ruling, only one of which is legally accurate.

overcome the presumption that the contract that CT [Miami] signed is a valid and binding agreement to arbitrate." The trial court buttressed that finding by making an additional finding in paragraph 4 that

> based on the record before it, including, but not limited to, the Distributor Agreement signed by CT [Miami] email communications, and CT[ Miami's] audited financial statements for 2010, 2011, 2012 and 2013, that the parties performed in accordance with the Distributor Agreement and in a manner consistent with the Distributor Agreement being a valid and binding agreement.

If the trial court had merely ruled that the arbitrator should decide the issue as CT Miami claims, it would not have made these specific factual findings.

Moreover, these findings were not couched in terms of deference to the arbitrator. If we remove the erroneous legal conclusions from paragraphs 5 and 7 of the order, the order stands independently as an order granting SELA's motion to compel arbitration based on the specific factual findings that a legal and binding contract was formed. Thus, the trial court did in fact find that the parties reached an agreement. The only issue left to resolve is whether the trial court had the authority to make such findings without the benefit of an evidentiary hearing.

### b. **The trial court was not required to conduct an evidentiary hearing where no "substantial issue" regarding the contract's validity was raised.**

CT Miami's final point on appeal is that the trial court was statutorily required to conduct an evidentiary hearing before ruling that the Distributor Agreement is a valid and binding agreement over CT Miami's protestations. CT

17

Miami would be correct if it had raised a "substantial issue" regarding the making of the agreement, but we agree with the trial court that it did not.

Section 682.03(1) of the pre-2013 Florida Statutes provides:

A party to an agreement or provision for arbitration subject to this law claiming the neglect or refusal of another party thereto to comply therewith may make application to the court for an order directing the parties to proceed with arbitration in accordance with the terms thereof. **If the court is satisfied that no substantial issue exists as to the making of the agreement or provision, it shall grant the application. If the court shall find that a substantial issue is raised as to the making of the agreement or provision, it shall summarily hear and determine the issue and, according to its determination, shall grant or deny the application.**

(emphasis added). Although the statute requires only that the trial court "summarily hear and determine the issue," id., decisions from the other district courts of appeal have clarified that a trial court should conduct an evidentiary hearing when a substantial issue regarding contract formation is raised, e.g., Crystal Motor Car Co. of Hernando, LLC v. Bailey, 24 So. 3d 789, 791 (Fla. 5th DCA 2009); Rowe, 932 So. 2d at 541-42; Tandem Health Care of St. Petersburg, Inc. v. Whitney, 897 So. 2d 531, 532 (Fla. 2d DCA 2005); Melamed, 425 So. 2d at 128. The question then becomes, "What constitutes a 'substantial issue?'"

In Chastain—which was cited with approval in Rowe, 932 So. 2d at 540-41— the Eleventh Circuit Court of Appeals held:

"To make a genuine issue entitling the [party seeking to avoid arbitration] to a trial by jury [on the arbitrability question], an unequivocal denial that the agreement had been made [is] needed, and

18

some evidence should [be] produced to substantiate the denial."

Chastain, 957 F.2d at 854 (quoting T&R Enters. v. Continental Grain Co., 613 F.2d 1272, 1278 (5th Cir. 1980)).  Florida cases have not so clearly elucidated a standard, but they all seem to echo Chastain's reasoning by agreeing that to raise a "substantial issue" requiring an evidentiary hearing, a party must identify factual disputes that, if resolved in its favor, would compel a different result.  See Wallshein v. Shugarman, 50 So. 3d 89, 92 (Fla. 2010) (holding that the trial court did not need to conduct an evidentiary hearing when the dispute could be resolved as a matter of law); Linden v. Auto Trend, Inc., 923 So. 2d 1281, 1283 (Fla. 4th DCA 2006) ("In this case, at the hearing on the motion to compel arbitration, Linden's attorney failed to specify any issue that required an evidentiary hearing."); Affinity Internet, Inc. v. Consolidated Credit Counseling Servs., Inc., 920 So. 2d 1286, 1289 (Fla. 4th DCA 2006) ("No evidentiary hearing was required because no factual issues were in dispute and the issue of whether a valid arbitration agreement existed was a matter of law."); Proper v. Don Connolly Constr. Co., 546 So. 2d 758, 759-60 (Fla. 2d DCA 1989) (holding that a trial court need not conduct an evidentiary hearing on a motion to compel or stay arbitration if it can determine the issue as a matter of law after inspecting the relevant documents and affidavits and listening to argument on the issues).

In this case, the following facts are undisputed.  SELA sent an email to CT

19

Miami stating in no uncertain terms that CT Miami had to sign the Distributor Agreement before SELA would agree to do business with it. The Distributor Agreement contains an arbitration provision requiring the parties to arbitrate any dispute arising from their relationship. The appropriate designated corporate officer from CT Miami signed that Distributor Agreement and returned it to CT Miami. Shortly after CT Miami signed that Distributor Agreement, the parties began conducting business together. They continued conducting business together for approximately five years in conformity with the terms of the Distributor Agreement. Several references are made to a "distributor agreement" in CT Miami's financial statements and emails, and many of these references are accompanied by apparent quotes or paraphrases from the Distributor Agreement.

These undisputed facts raise a nearly insurmountable presumption that the Distributor Agreement is a binding agreement and that the arbitration clause is therefore valid. First, a document executed by the party against whom the contract is sought to be enforced is presumptively valid even in the absence of the enforcing party's signature where the events surrounding the contract's execution support a valid contract. Dodge of Winter Park, Inc. v. Morley, 756 So. 2d 1085, 1085-86 (Fla. 5th DCA 2000) (holding that a seller could enforce an arbitration provision against a buyer even though only the buyer had signed the provision); see also Gateway Cable T.V., Inc. v. Vikoa Constr. Corp., 253 So. 2d 461, 463 (Fla. 1st

20

DCA 1971) ("A contract may be binding on a party despite the absence of a party's signature. The object of a signature is to show mutuality or assent, but these facts may be shown in other ways, for example, by the acts or conduct of the parties.").

Additionally, "[a] contract is binding, despite the fact that one party did not sign the contract, where both parties have performed under the contract." Integrated Health Servs. of Green Briar, Inc. v. Lopez-Silvero, 827 So. 2d 338, 339 (Fla. 3d DCA 2002); see also Alterra Healthcare Corp. v. Bryant, 937 So. 2d 263, 270 (Fla. 4th DCA 2006) (holding that a trial court correctly determined an agreement was binding despite one party's failure to sign the document where the parties performed under the terms of the contract). The undisputed facts that CT Miami signed the contract and performed in conformity with that contract, thereby receiving substantial financial gain, allowed the trial court to find that the agreement was binding unless CT Miami was able to raise factual disputes that called the validity of the agreement into question.

To meet its burden of establishing a "substantial issue" regarding the contract formation, CT Miami simply denied that the parties had intended to be bound by the Distributor Agreement (a legal conclusion), denied that any references to a "signed distributor agreement" were to **the** Distributor Agreement (a very dubious claim, as noted above), and alleged that all the parties' transactions

21

were governed by independent agreements (an allegation consistent with the Distributor Agreement). None of these allegations were substantiated with any evidence despite hundreds of pages of documents being attached to its motion to stay arbitration. The only factual dispute substantiated by the record, in the form of two signed affidavits, is CT Miami's claim that SELA intentionally failed to sign certain documents so that SELA would not be bound by them in the future. This factual claim, however, even if true, is completely irrelevant to the trial court's determination.

The trial court specifically found in its written order that CT Miami had not met its burden of establishing a substantial issue regarding the making of the Distributor Agreement, and that an evidentiary hearing was therefore unnecessary. We agree with this ruling, and echo the trial court's statement to counsel during the hearing on the motion to compel/stay arbitration: "You know, having said that, I have to say Mr. Gutchess, that was an excellent argument but you are not a miracle maker. You can't change the facts, and I just find that the facts are not sufficient to overcome a signed agreement under the circumstances in this case."

The "[s]peedy resolution of disputes is the raison d'etre of arbitration," Melamed, 425 So. 2d at 128, so it would be completely nonsensical to require an evidentiary hearing and full discovery on an issue that the trial court can easily resolve as a matter of law. Thus, we hold that the trial court did not err by failing

22

to conduct an evidentiary hearing.

## CONCLUSION

The trial court erred in this case by making an alternative holding that the arbitrator, not the trial court, could rule on the issue of whether the parties had ever assented to a contract containing an arbitration clause. Unlike other contractual defenses pertaining to the entire contract, this third category of challenge regarding whether an agreement was ever consummated in the first place is to be decided exclusively by the trial courts. Despite this error, the trial court went on to make all the requisite factual findings that an agreement had indeed been reached between the parties, and it correctly granted SELA's motion to compel arbitration on that basis. There was no need for an evidentiary hearing on whether an agreement had been reached due to the undisputed facts and overwhelming evidence establishing an agreement between the two parties where CT Miami's allegations and evidence challenging that finding were either unsupported or irrelevant.

Affirmed.